**MOLLICA v. UNITED STATES et al.**
**THE JOHN BARTON PAYNE.**
No. 18603.

United States District Court
E. D. New York.
Sept. 23, 1953.

Thomas O'Rourke Gallagher, Brooklyn, N. Y., for libelant; Jacob Rassner, New York City, of counsel.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for respondent, by Kirlin, Campbell & Keating, Raymond Parmer, New York City, of counsel.

ABRUZZO, District Judge.

The libelant is a stevedore, and at the time of the accident worked on the S. S. John Barton Payne. During the trial it was conceded that the vessel was owned and operated by the United States, and libelant agreed to prosecute the action against the United States alone.

Carter & Weeks, Inc., libelant's employer, was loading Hatch No. 2 of the vessel. There came a time on the date of this accident when a heavy case, 6 feet high, 6 feet long, and 12 feet in width, weighing about 2½ tons, was loaded into the hold. Dunnage boards had been set with rollers on them to rest the case. This heavy case had been loaded into the hold and rested about 2 feet from the place where it was to be stowed. The rollers were removed and grease applied to the dunnage and the deck.

The libelant and his crew of longshoremen had to change the rigging. A snatch block was attached, held in place by a beam clamp, and the cable from the up and down winch was passed through the snatch block. A drag line was placed around the belly of the case and then a dog hook was attached to the rear of the case for the purpose of having the winch assert pressure so as to drag the case from its resting place into a small space between two other cases.

The libelant testified that at that time he went looking for more dunnage. While he was doing this, the hatch boss signaled by whistle to the gangwayman to go ahead and try to bring the case into place, but the case did not move. The gangwayman then called to the winchman to find out what was wrong and the winchman stated that there was no steam in the winch. At that time there was a sudden burst of steam that ripped the dog hook off the end of the case. It flew across the hold and struck libelant in the back of the head and he sustained the injuries for which he now seeks compensation.

There is testimony that on two previous occasions on the night of the accident the gangwayman had complained to the deck officer that the winch was not working properly. The deck officer sent a machinist to examine the winch and he stated that he could not do anything to remedy the defect.

This briefly summarizes the testimony offered by the libelant in support of his contention that the United States was negligent and that its negligence caused this accident.

The witnesses in opposition to the libelant testified that the steam used to operate the winches was supplied by the ship; that sufficient steam pressure had been maintained throughout the time libelant and his crew were working in Hatch No. 2; and that no complaint had been made of any defect in the winch.

There is some testimony presented that the case was not hooked up as testified to by the libelant's witnesses, but that I do not think is material at the moment. There is also some confusion as to whether it was an English winch or an American winch, but I do not think that issue is material.

Negligence can only be predicated upon the theory adopted by the libelant, that the winch was defective in that the steam did not flow freely and evenly, but intermittently; that a complaint had been

made to this effect; and that a sudden burst of steam ripped the dog hook off the end of the case. The dog hook was either ripped off because of that issue of negligence or because of the negligence of the libelant and his crew of stevedores in not using care and caution in their attempt to fit this long heavy case into a small space. If the accident happened in any other way except that claimed by the libelant, he must be non-suited.

■ I believe that the accident occurred because the winch was defective in that the steam was flowing intermittently and not evenly, and that the sudden burst of steam coming unexpected ripped the dog hook off the end of the case.

I believe that complaints had been made that the winch was defective and nothing was done to remedy that defect. The libelant is, therefore, entitled to compensation.

After the accident, libelant was removed to the Greenpoint Hospital where he had six sutures taken in the scalp wound in the Emergency Room of the hospital. He was then taken home in an automobile and four or five days later he went to the Brooklyn Hospital (no evidence has been presented to show whether he was hospitalized or not).

Dr. Nichols who first examined libelant on September 20, 1949, testified that his present symptoms are pain in the occiput, posteriorly, the left side, opposite to the scar; he has a dizziness and cannot bend over, and that he had seizures resembling epilepsy (libelant has a history of epilepsy prior to the accident), and that his libido is diminished, meaning that he has little interest in the sexual act. Dr. Nichols also testified that he made a diagnosis of traumatic neurosis. The doctor examined libelant again on May 14, 1951, and at that time some symptoms had moderated but the diagnosis was unchanged.

Dr. Hyslop examined libelant on May 22, 1951, on behalf of the United States. He testified that libelant had unsuccessful control over his equilibrium and that all other signs were normal; that libelant had some physical nerve disorder that flowed from either a 1942 injury sustained by libelant or the 1945 injury (involved in the case at bar).

Dr. Ambler examined libelant on behalf of the compensation carrier of libelant's employer on January 14, 1946, and finally on April 1, 1946. Dr. Ambler found that libelant had a scar on his head, specifically 1½ inches in length, within the hair line and tender on palpation. He recommended hospitalization and libelant was hospitalized at St. Vincent's Hospital for about a week. Dr. Ambler also testified that libelant showed very objective neurological abnormal findings, especially the deep tendon reflexes.

The libelant testified that he was taken to Greenpoint Hospital, later to the Long Island College Hospital, to a Dr. Moses Kershner, and then to Brooklyn Hospital. He testified to his hospitalization at St. Vincent's Hospital and that he was treated by four other physicians.

Earnings claimed to have been lost by libelant:

In 1943 libelant earned $2,223.63
In 1944 libelant earned $4,149.56
In 1954 libelant earned $2,897.76

$9,270.95
Average earnings ..... $3,090.31

In 1946 he earned $117.45. In 1947 he earned a few hundred dollars; in 1948 a few hundred dollars; in 1949 about $200; and nothing in 1950, 1951, and 1952.

■ It is very difficult for me to judge exactly what amount should be awarded to the libelant in view of his prior accident and history of injuries; however, I think it is fair and just that he should be awarded a sum of $6,750.

Submit findings of fact, conclusions of law, and a decree in accordance with this opinion.